IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

NATE A. LINDELL,

                                 Plaintiff,

   v.                                                                OPINION and ORDER

LARRY FUCHS, et al.,                                          23-cv-805-amb

                                 Defendants.

---

Plaintiff Nate A. Lindell, a state prisoner representing himself, alleges that a correctional officer at Columbia Correctional Institution, Ashley Suprise, sexually assaulted him and issued a false conduct report against him to discredit any complaint. He further alleges that the remaining defendants, also Columbia Correctional staff, knew Suprise posed a risk of harm to inmates yet turned a blind eye to her alleged conduct in this case and approved the conduct report. Plaintiff is proceeding on Eighth Amendment claims against Suprise for the alleged assault, and against the remaining defendants for failing to prevent further emotional or psychological harm to plaintiff. Dkt. 9 at 8–9, 17.

Defendants have filed a motion for summary judgment on all of plaintiff's claims on the merits or, alternatively, under the doctrine of qualified immunity for all defendants except Suprise. Dkt. 25. Plaintiff has renewed his motion to compel defendants to provide supplemental responses to certain discovery requests. Dkt. 60. For the following reasons, defendants' motion is GRANTED as to all of plaintiff's claims except for his Eighth

Amendment claim against Suprise, which will proceed to trial.[1]  Plaintiff's motion to compel is DENIED, but the parties are ORDERED to meet and confer by the deadline indicated below on any remaining discovery issues related to plaintiff's claim against Suprise.

## JURISDICTION

This case was originally assigned to a district court judge, who screened plaintiff's complaint.  Dkt. 9.  The parties have since consented to jurisdiction by a United States Magistrate Judge.  Dkt. 20.  The court has original jurisdiction over plaintiff's claims because they arise under the Constitution of the United States.  28 U.S.C. § 1331.

## FINDINGS OF FACT[2]

### A.  The parties

Plaintiff, a state prisoner, was incarcerated at Columbia Correctional Institution at all times relevant to this lawsuit.

The defendants all worked at that institution:  defendant Larry Fuchs as Warden, defendants Ryan Blount and Gwen Schultz as security directors, defendants Kevin Pitzen and

---

[1] Plaintiff seeks leave to file a sur-reply in opposition to defendants' motion for summary judgment contesting defendants' arguments regarding plaintiff's claim against Suprise. Dkt. 62.  The motion is GRANTED and the court has considered plaintiff's arguments, although they did not affect the court's reasoning, conclusions, or the ultimate result. Plaintiff's sur-reply raises points about Suprise that were already in the record and already considered by the court, so defendants are not prejudiced by the court accepting it.

[2] I find the following facts are material and undisputed, unless otherwise noted, based on the parties' briefing, their proposed factual findings, responses, replies, and objections, and considering the evidence of record in the light most favorable to plaintiff as the non-moving party. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

Jason Chatman as captains, defendant Kyle Zenk as an inmate complaint examiner, and defendants Ashley Suprise and Bryan Gerry as correctional staff.

## B.  The alleged sexual assault

At approximately 6:30 p.m. on November 10, 2020, plaintiff was moved to Housing Unit 2 following a Covid-19 quarantine.  Suprise was working on the unit as a floor officer and a nondefendant officer was working in the dayroom control "bubble," an enclosed room where staff can observe the housing unit's hallways and dayroom.  Suprise allowed plaintiff to clean his new cell due to Covid-19 concerns before moving several large bins of his property one by one from the nearby dayroom and down a hallway into the cell.  The process took about an hour.

Plaintiff alleges that while he was moving into his new cell, Suprise called him into the unit's meeting room, slid her hands down his pants, touched his genitals, and then bent over and pressed herself against his genitals.  Plaintiff alleges he warned Suprise that she was violating the Prison Rape Elimination Act (PREA), and Suprise threatened that plaintiff had better not complain.  So, plaintiff went back to moving and unpacking his property in the hope that "the matter would blow over."  Dkt. 1-1, ¶ 32.  But, as discussed in greater detail below, Suprise later issued a conduct report against plaintiff for alleged disrespect, disruptive conduct, loitering, and disobeying orders.

## C.  Video of plaintiff's move-in process

Plaintiff's move-in process was captured across two different videos—one of the dayroom and one of the hallway.  Neither video recorded audio.  The dayroom video begins with plaintiff setting two large bins on a dayroom table and approaching the control bubble where he appears to speak to the officer inside as well as Suprise, who is standing nearby.

Dkt. 29-4, 00:21–1:22. Plaintiff then retrieves a broom and dustpan, pauses again at the control bubble, and proceeds down the hallway, followed about a minute later by Suprise carrying what appear to be cleaning supplies. *Id.* at 1:37–3:41. The hallway video shows plaintiff proceeding into his new cell with the broom and moving a chair out into the hallway, where Suprise places cleaning supplies about a minute later. Dkt. 49, 00:22–1:45. Suprise hands plaintiff several items and then leaves the hallway while plaintiff sweeps and cleans his cell. *Id.*, 1:44–3:21.

Over the next few minutes, the hallway and dayroom videos show plaintiff moving his property into his cell bin by bin, at times with Suprise nearby. At that point, Suprise follows plaintiff down the hallway as he is carrying a bin and waits outside his cell for him to emerge carrying a mattress pad that he takes back through the dayroom with Suprise following. *Id.*, 8:24–9:04. Plaintiff and Suprise cross the dayroom and go through a door in the bottom lefthand corner of the frame where they remain out of frame for approximately 12 seconds before plaintiff reappears without the mattress followed by Suprise. Dkt. 29-4, 11:05–11:49. Plaintiff resumes moving his property as Suprise walks away in the opposite direction.

About half an hour later, Suprise walks to plaintiff's new cell, stacks his bins that are in the hallway, and leans up against the wall outside his cell on one arm. Dkt. 49, 41:37–41:48. Plaintiff is in his cell, off camera. Suprise stands there for around a minute and appears to be speaking with plaintiff before she takes a bin from him and stacks it on top of the others. *Id.*, 41:48–42:45. She remains standing by the stack of bins in the hallway outside plaintiff's cell for two minutes before taking another bin from plaintiff that she stacks with the others and pushing the stack down the hallway and out of frame. *Id.*, 42:45–44:43. Suprise returns about

10 minutes later to retrieve a spray bottle left in the hallway and the chair from outside plaintiff's cell and then leaves the hallway.  *Id.*, 55:38–56:32.

**D. Plaintiff's conversation with defendant Jason Chatman**

Later that same evening, defendant Jason Chatman went to plaintiff's cell to ask whether he was still feeling "a little heated" after an alleged altercation between plaintiff and Suprise during plaintiff's move.  Dkt. 48, 0:09–0:14.  The conversation was captured on Chatman's body worn camera.

Chatman informed plaintiff that he was being moved to temporary lockup, a restrictive housing status, due to his alleged disruptive conduct "in his cell" and "with the boxes" while relocating to Housing Unit 2.  *Id.*, 0:36–0:55.  Plaintiff explained that he still felt sick and had become frustrated when Suprise had tried to rush him through his move, but he denied yelling. He repeatedly asked how he had been disruptive, and Chapman responded that details would follow in a formal conduct report.  Plaintiff also expressed concern about his personal property and wanted to pack it himself rather than risk its loss while in restrictive housing should officers or inmates later pack it for him.  Chatman allowed plaintiff a few minutes to organize his belongings but declined plaintiff's request to resolve the matter informally and escorted plaintiff from his cell.

**E.  The conduct report**

Suprise submitted a formal conduct report against plaintiff on November 12, 2020. She alleged that she instructed plaintiff to empty and return the bins before it was time to distribute medications at 7:00 p.m., and that plaintiff also received repeated instructions from the control bubble officer to unpack his bins, but plaintiff "loitered on and off for the next approximately 30 minutes speaking with other inmates in their cells."  Dkt. 29-1 at 15.  Suprise

5

further alleged that plaintiff became agitated, yelled profanity at her, and "grabbed the tote he was unpacking aggressively as if he was going to throw it at" her when she advised him that he could place some of his property on the empty top bunk. *Id.*

Suprise also reported that plaintiff then allegedly threw a bin on the top bunk to empty it and did the same with the last bin while continuing to yell and swear. Suprise felt threatened at that point, and placed her hand on her body alarm, but plaintiff then handed her the remaining bins, and she was able to quickly shut and secure the cell door. Suprise quickly told Chatman about the altercation, who then went to speak with plaintiff in his cell a few minutes later as recorded on Chatman's body worn camera.

The conduct report was signed by defendant Security Director Gwen Schultz, who determined that the report should proceed to a hearing for a major offense.

### 1.  The initial hearing

Plaintiff contested the conduct report, and a hearing was held on November 23, 2020, in front of defendant Lieutenant Bryan Gerry. In preparation for the hearing, plaintiff requested that the control bubble officer and an inmate testify, and that video from Chatman's body worn camera as well as the hallway and dayroom video footage be reviewed. On November 19, 2020, defendant Security Director Ryan Blount approved the witness attendance requests and the use of the body worn camera video but did not allow "overhead" video because it "d[id] not exist." Dkt. 29-1 at 21. This was incorrect. In fact, the video had been preserved in relation to another inmate's conduct report. Dkt. 27, ¶ 10.

Blount attests that he denied the request because he had not retained the footage himself and mistakenly thought the hallway and dayroom video had been overwritten. He also attests that Suprise's "conduct report revolved around the interactions between [plaintiff] and

6

Suprise," and the requested footage "would not have shown what the interaction sounded like or even the individuals' actions looked like" because it was recorded from a "distant viewpoint with no audio." *Id.*, ¶ 8. Plaintiff disputes Blount's explanation, and states that Blount denied his request to use the dayroom and hallway video because he knew that the contents would exonerate plaintiff.

At the hearing, plaintiff denied screaming, swearing, or throwing bins, and stated that he "neatly unpacked" his belongings while Suprise rushed him and yelled at him to give her his bins. Dkt. 29-1 at 18. Plaintiff admitted that "there is an arguable claim that [he] loitered" by talking to two other inmates but stated that neither Suprise nor the control bubble officer told him to get back to his cell. *Id.* The control bubble officer testified that while there was screaming and yelling, she "felt it was more about the situation than directed at" Suprise and that she, the control bubble officer, had not said anything to plaintiff. *Id.* at 20. The inmate witness was unavailable to attend the hearing due to Covid-19 restrictions, and Suprise did not testify.

In addition to the testimony and the conduct report, Gerry reviewed Chatman's body worn camera video and noted that dayroom and hallway videos were not available. He found that plaintiff had not disobeyed orders, but "more likely than not" had been disrespectful and disruptive, and had loitered, and imposed 15 days' cell confinement. *Id.* at 19.

Plaintiff objects to Gerry's conclusions, stating that he did not give sufficient weight to the exculpatory testimony.

### 2. Plaintiff's appeal and inmate complaint

Plaintiff appealed Gerry's determination to defendant Warden Fuchs. He argued that Gerry should not have found Suprise's conduct report credible in light of the testimony and

that the dayroom and hallway video should have been considered.  Upon review, Fuchs upheld the cell confinement, but modified Gerry's decision by finding plaintiff had not disobeyed orders in light of the control bubble officer's testimony that she had not said anything to plaintiff.  Fuchs also noted that while the dayroom and hallway video should have been considered, that evidence ultimately would not have shed light on the remaining issues.  Fuchs attests that he reached this conclusion because the video at issue had no audio.  Dkt. 26, ¶ 12.  Plaintiff objects to this statement as a "post-hoc explanation invented for litigation."  Dkt. 56, ¶ 19.

Plaintiff then filed an inmate complaint received by the institution on December 7, 2020, complaining that the dayroom and hallway video should have been admitted.  He argued that even without audio, the requested video would show what happened between him and Suprise.  He also noted that he had filed a complaint against Suprise under the Prison Rape Elimination Act (PREA), which plaintiff believed Suprise sought to discredit by filing the conduct report.  And he argued that dayroom video would support that PREA complaint by showing them entering the housing unit's meeting/storage room together.  Plaintiff wondered how Gerry could find any of Suprise's assertions about him credible in light of the control bubble officer's testimony.

Defendant Inmate Complaint Examiner Kyle Zenk recommended dismissing the inmate complaint on procedural grounds.  Zenk explained that Fuchs had already reviewed and taken action on plaintiff's allegations, and "[a] parallel investigation is not necessary nor allowed per policy."  Dkt. 29-2 at 2.  Fuchs adopted that recommendation and plaintiff appealed to a corrections complaint examiner and the Secretary of the Wisconsin Department of Corrections (DOC), who returned the complaint "for priority investigation."  *Id.* at 6.  Zenk reviewed

plaintiff's complaint a second time, addressed the merits and again recommended dismissal, noting that plaintiff mischaracterized a statement in the conduct report, and that the requested "tier footage" had no evidentiary value because it did not show the inside of plaintiff's cell or include audio. *Id.* at 7. Fuchs, however, did not adopt that recommendation and ordered a rehearing to include the dayroom and hallway video.

### 3. The rehearing

The rehearing was held before a nondefendant officer on February 5, 2021. Plaintiff requested that Suprise testify, noting that he "might file a PREA on her; so she sought to discredit me by accusing me of maniacal behavior in this [baseless conduct report]." Dkt. 29-1 at 34. Suprise was not available to testify, but plaintiff also requested review of the dayroom and hallway video, which was allowed.

Based on the additional video evidence, and the control bubble officer's testimony at the initial hearing, the conduct report was dismissed and removed from plaintiff's record due to "the inaccuracy of information provided by report writer," namely, Suprise. *Id.* at 31.

### F. Plaintiff's PREA report

While contesting Suprise's conduct report, plaintiff filed a PREA complaint against Suprise.[3] He was interviewed by a detective from the Columbia County Sheriff's Office and by defendant Kevin Pitzen on December 29, 2020. Plaintiff stated that Suprise had asked him

---

[3] Plaintiff filed an inmate complaint on November 20, 2020 alleging that Suprise sexually assaulted him in "the unit's storage room." Dkt. 42-2 at 54. A non-defendant inmate complaint examiner reviewed the complaint and recommended dismissal and immediate referral per policy to the PREA compliance manager. *Id.* at 46. Defendant Warden Fuchs adopted that recommendation, and his decision was distributed to several individuals, including defendant Blount, on November 24, 2020. *Id.* at 47. Plaintiff unsuccessfully appealed.

to bring a mattress to a storage room while he was moving into a new cell and "[s]omething happened in there."  Dkt. 29-3 at 2.  He did not want to say exactly what happened and explained that he had to be "careful about what I say" because Suprise "lied on me."  *Id.*  Plaintiff was told that without "specifics," the investigation would not proceed, and plaintiff responded that he could not give "any specifics."  *Id.*  Plaintiff told the investigators that he would contact them if he wanted to speak further.

## G. Suprise's termination from the DOC

Plaintiff contends in his proposed findings of fact that, before and during her employment with the DOC, Suprise "accumulated multiple criminal convictions" and was previously incarcerated.  Dkt. 57, ¶¶ 1, 4.  He further contends that "DOC supervisors" were required to conduct criminal history checks of correctional officers and were repeatedly warned about Suprise's workplace misconduct, but "failed to review or act upon Suprise's criminal history," to adequately monitor "at-risk staff," or take other remedial action.  *Id.*, ¶¶ 3, 6, 7, 11.  Plaintiff maintains that defendants failed to properly investigate Suprise's report against him or his PREA report, or otherwise protect him from her.  Defendants object to plaintiff's assertions as unsupported, based on unauthenticated documents, and improperly argumentative.

In support of his position, plaintiff has submitted documents purportedly from a private investigator or a nonparty assisting him with his evidentiary materials in this case.[4]  *See* Dkt. 39.  These documents include what plaintiff asserts are printouts of publicly available Wisconsin

---

[4] This nonparty, Brianna Burton, has filed a motion to intervene and attend and record the final first final pretrial conference to be held over Zoom.  Dkt. 62.  She has also filed a request to access the video evidence in this case.  Dkt. 63.  The court will address these matters separately.

state court criminal case docket information concerning an "Ashley N. Johnson" and an "Ashley Nicole Suprise," and a copy of an internal investigation report about Suprise that led to her termination as a correctional officer. *See* Dkt. 39 & Dkt. 42-3. The state court docket information that predates the alleged assault in this case indicates that:

- Ashley N. Johnson pled guilty/no contest as a minor to theft as a party to a crime in 2003 and was sentenced to probation in Waupaca County Circuit Court.[5] Dkt. 42-3 at 1–8.

- Ashley Nicole Suprise pled no contest to failure to wear a seatbelt in 2019 in Dane County Circuit Court. *Id.* at 9–12.

As for the purported internal investigation report, it indicates that Suprise was arrested on February 27, 2021 for operating while intoxicated and possession of THC and taken to Columbia County Jail. *Id.* at 48. Suprise admitted during the investigative interview to smoking marijuana the day before, driving after drinking two beers and that there was a THC edible in her car. *Id.* at 45. She also alluded to an issue with a supervisor. *Id.* at 46, 50. Suprise was terminated on March 15, 2021 "for failure to meet probationary standards" as a result of the investigation. *Id.* at 60.[6]

---

[5] Whether this individual is Suprise is not confirmed in the record. Defendants state that "[g]iven the tight turnaround" to reply in support of their motion, they cannot make any "representation as to whether" Johnson and Suprise are the same person. Dkt. 58 at 2 n. 1. For purposes of this motion, the court assumes they are.

[6] Plaintiff has also submitted court records purporting to concern a 2024 charge against Suprise for theft as a party to a crime that resulted in a deferred prosecution agreement. Dkt. 42-3 at 34.

LEGAL STANDARDS

Defendants have filed a motion for summary judgment. Summary judgment is appropriate when there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In determining whether there are genuine factual disputes, the court examines the record in the light most favorable to the party opposing judgment and construes all reasonable inferences from the evidence in their favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). Mere conclusory allegations do not constitute evidence. *See Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Further, disputed facts that are not outcome-determinative are not material and will not preclude summary judgment. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997).

ANALYSIS

**A. Threshold matters: requests for injunctive relief and discovery**

 **1. Request for injunctive relief**

Plaintiff requests injunctive relief in his response to defendants' summary judgment motion, which is relief plaintiff may seek when suing individuals in their official capacities. *Knowlton v. City of Wauwatosa*, 119 F.4th 507, 519 (7th Cir. 2024). Specifically, he names the Secretary of the Wisconsin Department of Corrections and requests "policies requiring adequate supervision, training, and monitoring of correctional staff" in light of alleged "failures documented in this case" to "prevent future assaults" and "ensure compliance with constitutional standards." Dkt. 53 at 23–24.

The Secretary of the Wisconsin Department of Corrections is not a defendant in this case, and plaintiff cannot add this defendant and pursue this claim for injunctive relief at this late stage. Although he requested injunctive relief in his complaint, it was different in nature—he sought to prevent defendants from placing him on a restricted housing status without first verifying the allegations against him and to require correctional staff to use body cameras when interacting with him and handling his property. Dkt. 1-1, ¶ 89. More to the point, plaintiff was not granted leave to proceed on a claim for injunctive relief, see Dkt. 9 at 17 & 21, and cannot amend his complaint now through a response brief. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011) (it is "axiomatic" that "a plaintiff may not amend his complaint in his response brief").

### 2. Plaintiff's discovery motions

Plaintiff claims he is unable to fully defend against defendants' summary judgment motion because the court denied his motion to compel discovery. Specifically, plaintiff contends that he was denied files of any internal investigations and disciplinary actions concerning Suprise, communications between Suprise and unspecified supervisors, information and content from defendants' personal social media accounts, and video footage. After summary judgment briefing closed, plaintiff filed a renewed motion to compel defendants to respond to certain discovery requests, Dkt. 60, that defendants oppose, Dkt. 65. The court will not reconsider its previous rulings, and will deny his latest motion, but it will order the parties to meet and confer in preparation for trial on plaintiff's surviving claim against Suprise.

### a. Plaintiff's discovery issues

Plaintiff's brief in opposition to defendants' motion for summary judgment was initially due October 2, 2025. He filed a request for a six-month extension on September 8, 2025,

stating that institution staff were interfering with his access to the law library and harassing him, and he was litigating multiple lawsuits. He also requested that the court compel defendants to "supply the footage from the hallway and internal investigative records regarding [Suprise's] misconduct that resulted in her termination and/or is related to sexual misconduct with prisoners." Dkt. 33. The court granted plaintiff a 30-day extension, ordered the parties to meet and confer with a week about plaintiff's discovery concerns, and invited plaintiff to file a motion to compel if his concerns were not resolved. Dkt. 35.

Plaintiff renewed his request for a six-month extension on October 6, 2025, contending that staff were "persistently obstructing his use of the law library, while the defendants' counsel have persistently obstructed discovery." Dkt. 36 at 1. Specifically with respect to discovery, plaintiff said that he could not recall receiving complete responses to requests served ten months earlier in January 2025, and that defense counsel was not providing evidence that the previously assigned judge had ordered preserved. Dkt. 37, ¶¶ 13–15. The court acknowledged that plaintiff had remaining discovery concerns, but noted that he had yet to file a motion to compel and had been scheduled to review video evidence in time to complete a summary judgment response. Dkt. 38. The court declined to extend plaintiff's response deadline further.

On October 20, 2025, plaintiff filed a motion to compel. Dkt. 40. He took issue with defendants' February 2025 responses to his discovery requests, noted that he had since obtained case docket information and an internal investigation report about Suprise on his own, and underscored that he was seeking Chatman's body worn camera video in addition to other video evidence. The attached exhibits included a letter from defense counsel memorializing the parties' meet and confer. Dkt. 42-1 at 10–11. The letter indicated that the parties had discussed plaintiff's request for "overhead tier video" and Suprise's employment

14

files. *Id.* at 10. Defense counsel stated that Suprise's employment files would not be produced because such files are generally confidential and Suprise's files "do not contain information or an investigation into [plaintiff's] allegation of sexual assault in this case." *Id.* at 11. But defense counsel would produce the recently discovered "tier" or dayroom video. *Id.* at 10.

The court denied plaintiff's motion to compel because it did not appear that there were any additional materials to produce. Dkt. 47. All existing video evidence had been made available for plaintiff's review, and for good measure the court ordered defendants to file the remaining video evidence with the court for the parties' use at summary judgment. The court also declined to order duplicative production of internal investigative materials and state-court docket information allegedly concerning Suprise that plaintiff already had. The court granted plaintiff a final extension of his response deadline to November 21, 2025.

The court will not reconsider these rulings. The court attempted to assist plaintiff with his discovery concerns by extending his response deadline and ordering the parties to meet and confer, but plaintiff simply waited too long to start litigating discovery requests served in January 2025. He received responses about seven months before summary judgment was filed and did not raise any discovery concerns beforehand nor file a motion to compel for another two months. As the court instructs in its preliminary pretrial conference order, "[i]f the parties do not bring discovery problems to the court's attention quickly, then they cannot complain that they ran out of time to get information that they needed for summary judgment or for trial." Dkt. 23.

Regardless, plaintiff has not been prejudiced. He had access to all existing video footage before his summary judgment response materials were due, and the videos were also filed with the court. As far as his requests for Suprise's personnel files and communications with

supervisors and all of defendants' social media account information and contents, parties may

obtain "nonprivileged matter that is relevant to any party's claim or defense and proportional

to the needs of the case," considering among other factors "whether the burden or expense of

the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The court has

considered in this order the criminal case docket information and investigative report he did

obtain, but these materials, as explained in greater detail below, do not suggest that Suprise

has a history of misconduct towards inmates that merits such broad additional discovery.

### b.  Plaintiff's second motion to compel, Dkt. 60

After summary judgment briefing closed, and a day before discovery closed, plaintiff

filed a second motion to compel. Dkt. 60. He seeks to compel defendants to supplement their

November 2025 responses to his October 2025 discovery requests. Specifically, he seeks

"discovery addressing credibility, supervisory knowledge, hiring decisions, discipline processes,

and DOC handling of reports related to former Officer Ashley Surprise [sic]" as well as other

names she may have used, information about a deferred prosecution agreement she allegedly

entered into in 2024, and the meaning of her nickname. *Id.* at 1–2. To the extent plaintiff

sought any of this discovery for summary judgment, he mailed his requests too late, about two

and a half weeks before his response deadline, which was November 3, 2025 at the time.

Regardless, the court will deny the motion. Federal Rule of Civil Procedure 37(a)(1)

requires a certification of a good faith attempt to meet and confer before seeking court

intervention in a discovery dispute. Plaintiff does not certify that he tried to meet and confer

about his latest discovery issues. Rather, he attached a November 25, 2025 email that a non-

attorney, nonparty sent defense counsel from a Gmail account on behalf of plaintiff, raising

concerns with defendants' responses. *See* Dkt. 61, ¶ 12 (plaintiff attests that the email was

sent by his "assistant" to defense counsel) & Dkt. 61-10 (email). This does not satisfy the meet and confer requirement—defense counsel is under no obligation to respond to communications sent by non-attorney, nonparties on behalf of litigants.

That said, plaintiff is proceeding to trial on his Eighth Amendment claim against Suprise. So, the court will reopen discovery for a limited time and for the limited purpose of allowing the parties to meet and confer concerning any remaining discovery related to this claim that plaintiff may need for trial. In conferring, plaintiff must keep in mind the scope of his surviving claim. If outstanding discovery issues remain after the parties meet and confer, the parties may raise these issues in their pretrial filings due by the deadline indicated below.

## B. Plaintiff's Eighth Amendment claims

Plaintiff is proceeding against all defendants on Eighth Amendment claims. Inmates have the right to "humane conditions of confinement," and "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832, 114 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). The Eighth Amendment's prohibition of cruel and unusual punishment protects prisoners from conditions of confinement that "involve the wanton and unnecessary infliction of pain[.]" *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). This prohibition includes acts that are "totally without penological justification." *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (citation omitted).

A prison official's conduct may violate the Eighth Amendment if "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference." *Id.* Courts refer to this standard as requiring "deliberate indifference" to or "conscious disregard" of a risk of harm.

### 1. Ashley Suprise

Plaintiff alleges that Suprise sexually assaulted him in the housing unit's meeting or storage room while he was moving into a new cell, in violation of his Eighth Amendment right to be free of cruel and unusual punishment, and then threatened him to ensure he did not complain. A reasonable jury could conclude that Suprise's conduct, if true, objectively imposed a serious risk to plaintiff's safety and that Suprise threatened plaintiff because she knew of that risk. *See J.K.J. v. Polk Cnty.*, 960 F.3d 367, 376 (7th Cir. 2020) ("To say that the sexual assaults [a jail guard] committed against [two inmates] objectively imposed serious risk to their safety would be an understatement.").

Defendants did not address plaintiff's claim against Suprise in their motion for summary judgment beyond stating that his allegation of assault was "deficient" due to a "lack of evidence." Dkt. 30 at 8. Defendants further assert in reply that the video evidence disproves plaintiff's allegation because the hallway video does not show Suprise ever entering his cell. Dkt. 58 at 4–5. Defendants presumably focus on this location—plaintiff's cell—because that is where plaintiff said the assault took place in his response brief. Dkt. 53 at 9. But that one reference is an outlier. Plaintiff alleges in his verified complaint that Suprise sexually assaulted him in "the unit two meeting room" off the dayroom, Dkt. 1-1, ¶¶ 29–30. This allegation is substantially consistent with what he stated during his PREA interview, *see* Dkt. 29-3 at 2 (calling it a storage room), and in his inmate complaint, *see* Dkt. 42-2 at 54 (calling it the "unit's storage room"). The dayroom video supports this account, showing Suprise and

plaintiff enter a room off the dayroom where they remain for 12 seconds off camera before emerging and walking away in opposite directions.

Construed in plaintiff's favor, this evidence is sufficient for a reasonable jury to conclude that plaintiff was sexually assaulted as he alleges. When a videotape "blatantly contradict[s]" the non-movants version of facts in such a way that it is "so utterly discredited by the record that no reasonable jury could have believed him," there is no "genuine" dispute, and the court should view the facts in light of the video. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). That is not the case here. Twelve seconds is not a long time, but defendants do not argue, nor can the court conclude as a matter of law, that it is an impossibly insufficient amount of time for Suprise to insert her hand down plaintiff's pants, touch his genitals, and then back up into his genitals as plaintiff alleges she did. There are inferences that can be made from the existing video evidence that suggest no sexual assault occurred, but that evidence does not "utterly discredit" plaintiff's claim. *Id.*

At bottom, the evidence is too inconclusive to grant summary judgment in Suprise's favor. *See Barrows v. Blackwell*, Case No. 13-cv-1483, 2016 WL 1122838, at *5–7 (C.D. Ill. March 22, 2016) (summary judgment is inappropriate where video evidence is inconclusive regarding plaintiff's sexual assault claim). And deciding whose version of events is most credible is a task for a jury.[7] *See Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704–05 (7th Cir. 2011) ("[D]istrict courts presiding over summary judgment proceedings may not weigh conflicting evidence or make credibility determinations, both of which are the province

---

[7] Suprise responded to plaintiff's first set of interrogatories, Dkt. 42-1 at 21, but she did not submit a declaration with defendants' summary judgment materials. The court presumes that she denies plaintiff's allegations.

of the jury." (cleaned up)).   Accordingly, defendants' motion is DENIED with respect to Suprise and plaintiff's Eighth Amendment claim against her will proceed to trial.

### 2.  The remaining defendants

As for the remaining staff defendants, plaintiff claims they failed to intervene in a conscious disregard of his constitutional rights.   Captain Chatman spoke with plaintiff at his new cell about Suprise's allegations and placed him on temporary lockup pending further investigation.   Security Director Gwen Schultz determined that Suprise's conduct report alleged a major offense and should proceed to a hearing.   In anticipation of that hearing, Security Director Blount approved plaintiff's witness attendance requests and the use of Chatman's body worn camera video but indicated that requested "overhead" video did not exist.   Dkt. 29-1 at 21.   Officer Gerry presided over the initial hearing.   Inmate complaint examiner Zenk and Warden Fuchs reviewed plaintiff's complaint about the conduct report process, and the warden, who also reviewed plaintiff's direct appeal of Gerry's determination, ultimately ordered a rehearing that resulted in the report's dismissal.   Finally, Captain Pitzen interviewed plaintiff regarding his PREA complaint after Fuchs referred plaintiff's inmate complaint alleging sexual assault.

Plaintiff contends that these "supervisory officials" "were deliberately indifferent in failing to prevent the assault despite having knowledge of [Suprise's] dangerous misconduct." Dkt. 53 at 4.   He disavows pursuing any claim "relating to false conduct reports or unrelated conditions of confinement."   *Id.*   This disavowal appears to be a response to defendants' opening brief, where they focus on their actions during the conduct report proceeding.   The court's screening order also focuses on how the remaining defendants *responded* to the alleged events, noting that plaintiff alleged these defendants turned a blind eye to Suprise's alleged

conduct by approving her conduct report, suggesting these defendants each had the authority and reason to "intervene regarding the plaintiff's claim of Suprise's alleged sexual assault that could have prevented him from suffering *further* emotional or psychological harm." Dkt. 9 at 9 (emphasis added).

Whether the court construes these claims as screened or as plaintiff defines them now, the remaining defendants are entitled to summary judgment in their favor. Prison officials generally "may be held liable for a constitutional violation if [they] knew about it and had the ability to intervene but failed to do so . . .with deliberate or reckless disregard for the plaintiff's constitutional rights." *Fillmore v. Page*, 358 F.3d 496, 505–06 (7th Cir. 2004). Liability for supervisors is "not vicarious" in this context—there needs to be personal involvement or "a connection between the supervisor's action or inaction and the violation at issue," and "the supervisor must have also had the necessary state of mind," the high standard of deliberate indifference in this case. *Bostic v. Murray*, No. 23-1665, 2025 WL 3248684, at *5–6 (7th Cir. Nov. 21, 2025).

### c.  Notice of a substantial risk of serious harm

As a threshold issue, plaintiff refers to these remaining defendants collectively in his response as "supervisory officials," "without specific allegations tying the individual defendants to the alleged unconstitutional conduct." *Grieveson v. Anderson,* 538 F.3d 763, 778 (7th Cir. 2008). It is not clear whether all of the remaining defendants were in fact Suprise's supervisors or had supervisory authority, or what the scope of their authority would have been. Even if they each had authority to change the course of events, prison officials, even supervisory officials, can only be held liable for their own actions under 42 U.S.C. § 1983, so such "[v]ague references to a group of 'defendants' . . . do not raise a genuine issue of material fact with

21

respect to those defendants." *Id.* (inmate plaintiff claimed "the defendants" failed to protect him).

Regardless, a reasonable jury could not conclude that any of the remaining defendants were on notice that Suprise posed a serious, escalating risk of harm to inmates before she allegedly assaulted plaintiff on November 10, 2020. Prison officials are not "free to ignore obvious dangers to inmates." *Farmer*, 511 U.S. at 842. But even if plaintiff's materials purporting to concern Suprise's criminal history are authentic and accurate, and even assuming as plaintiff argues that the remaining defendants had an obligation to review her criminal history, all any of them would have known upon review in 2020 was that Suprise had been convicted of theft as a party to crime as a minor in 2003 and was cited for failure to wear a seatbelt in 2019. This history does not suggest that Suprise posed a substantial risk of serious harm to inmates.

Suprise was also arrested and detained for operating while intoxicated and possessing THC, but that incident occurred on February 27, 2021, just over two weeks after the rehearing on the conduct report and its dismissal. The submitted court records indicate that several charges arising from this incident were dismissed, and that she ultimately pled guilty due to no contest to a first offense of operating while intoxicated. This arrest and related charges could not have informed the alleged events underlying this case. Even if they had, neither this criminal history nor the internal investigative report reference any previous misconduct involving inmates and otherwise do not speak to whether she posed a substantial risk of serious

harm to inmates. Consequently, these materials do not support the position that the alleged sexual assault was foreseeable.[8]

Plaintiff relies heavily on *Collins v. Suprise*, Case No. 21-cv-237 (W.D. Wis. 2021), a case filed in this court in which the inmate plaintiff alleged that Suprise and another correctional officer used excessive force on him on April 27, 2020, and that two captains, including defendant Gwen Schultz, investigated the incident but did not hold either officer accountable. Warden Fuchs was also named as a defendant, but the court dismissed him at the outset in its leave to proceed order and he was never required to answer. Specifically, the plaintiff alleged that Suprise sprayed him with a defense spray causing eye and nasal pain. Dkt 1 in the '237 case, ¶ 7. For plaintiff, this lawsuit provided notice to defendants in advance of the sexual assault alleged here that Suprise posed a serious risk of harm to inmates.

There are two problems with plaintiff's reliance on this unrelated case. First, the court dismissed the lawsuit for the plaintiff's failure to exhaust his administrative remedies, meaning that the allegations were never tested or proven and that the plaintiff failed to give the institution adequate notice of the issue and opportunity to correct it at the time it allegedly occurred. *See Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013) (inmates satisfy the exhaustion requirement when the prison receives notice of, and an opportunity to correct a problem).

---

[8] Although the court is considering these materials for purposes of summary judgment, when it must view the record in the light most favorable to the non-moving party, whether any of these materials would be admissible at trial, as plaintiff appears to argue they are, is another question for another day. As for the 2024 theft charge and deferred prosecution agreement, the court cannot conceive of any possible relevance to this case, as it involves unrelated conduct occurring years after Suprise was terminated from her employment with the DOC.

Second, plaintiff does not explain why any of the remaining defendants would have been aware of the April 2020 events alleged in this 2021 lawsuit before the alleged November 2020 sexual assault. *See Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997) ("Without . . . knowledge [of the alleged risk of sexual assault], defendants can hardly have been deliberately indifferent to [plaintiff's] safety."). The only overlapping defendants are Fuchs and Schultz. Fuchs was dismissed at the outset and never answered, was not the warden at the time of the alleged use of excessive force, *see* Dkt. 26, ¶ 2, and does not appear to have ever seen any inmate complaint or related correspondence about the incident, *see* Dkt. 23-2 in the '237 case. Schultz allegedly investigated the use-of-force incident at issue in *Collins*, but her involvement in the alleged events underlying this case is too tangential to constitute a violation of plaintiff's constitutional rights, as discussed in greater detail below.

### d. Defendants' conduct after the alleged assault

The defendants' conduct after the alleged assault does not create a genuine issue of material fact either. "Public officials do not have a free-floating obligation to put things to rights" and "cannot be hit with damages under § 1983 for not being ombudsmen." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). As noted, Shultz was not involved beyond verifying that the conduct report alleged a major offense and authorizing it to proceed to a hearing. Plaintiff does not explain why Shultz would have had any reason to suspect the report was false, or what steps she could have taken. To the extent plaintiff believes Shultz should have viewed the conduct report skeptically because of the allegations against Suprise in *Collins*, the conduct report did not involve any use of force and, as noted, the merits of the allegations in *Collins* were never tested.

Nor does plaintiff explain how Captain Pitzen evidenced a failure to intervene by investigating plaintiff's PREA complaint. The investigation could not move forward only because plaintiff refused to provide any details, and plaintiff does not explain why Pitzen had to press on with the investigation regardless.

As for Chatman, he spoke with plaintiff at his cell in response to Suprise's verbal complaint of an altercation. Although Chatman, to plaintiff's frustration, did not provide specific details regarding Suprise's allegations, Chatman was responding to a verbal complaint received minutes earlier from staff claiming to have felt threatened enough to consider using her body alarm. He would not have had time to review any evidence, but he did explain the basic situation to plaintiff, who admitted being frustrated with Suprise, and allowed plaintiff the courtesy of organizing his property before being escorted to temporary lock up. To the extent plaintiff believes Chatman should have done more, "the possibility that [a government official] could have done more does not evince deliberate indifference." *Hunter v. Mueske*, 73 F.4th 561, 567 (7th Cir. 2023). There is insufficient evidence for a reasonable jury to conclude that any of these defendants showed a reckless disregard for plaintiff's constitutional rights.

Defendants Blount, Gerry, Zenk and Fuchs all played more direct roles in the conduct report process. Plaintiff states that he is not pursuing any claim related to this process, but reasons that these defendants disregarded exculpatory evidence to protect Suprise or ignored her misconduct and thus created a culture that emboldened her. Specifically with respect to Blount, plaintiff speculates that his statement that the hallway and dayroom video did not exist was no mistake but rather Blount's attempt to conceal exculpatory evidence. But "[s]peculation cannot create a genuine issue of fact that defeats summary judgment." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

Plaintiff disagrees with how Gerry, Fuchs, and Zenk viewed and weighed the evidence in the conduct report proceeding and believes they also should have done more. But Gerry dismissed a charge against plaintiff after crediting exculpatory testimony from the control bubble officer and did not have the benefit of hallway or dayroom video. Nor can it be said that Fuchs showed a conscious disregard by dismissing an additional charge and ultimately taking the step of ordering a rehearing on the conduct report to include all video evidence.[9]

As for Zenk's recommendations to dismiss plaintiff's inmate complaint, there is no evidence to suggest he was deliberately indifferent towards plaintiff's constitutional rights. An inmate complaint examiner could show deliberate indifference by, for example, routinely shredding inmate complaints without reading them or intervening "to prevent the medical unit from delivering needed care." *Raemisch*, 555 F.3d at 595. But an inmate complaint examiner is not liable for "carr[ying] out [his] job exactly as [he] was supposed to do," including by rejecting procedurally deficient complaints or dismissing complaints on the merits upon review and any necessary investigation. *Id.* Plaintiff may disagree with the examiner, and the conduct report may have been later dismissed, but these points do not support the conclusion that Zenk was deliberately indifferent.

---

[9] Plaintiff's inmate complaint about the sexual assault does not compel a different conclusion. Blount received notice of Fuchs' decision to refer the complaint to the PREA compliance manager five days after he reviewed plaintiff's witness and evidence requests in anticipation of the conduct report hearing, so the inmate complaint could not have informed Blount's review. *See* Dkt. 42-2 at 47 (dated November 24, 2020). And Fuchs cannot reasonably be found to have shown conscious disregard of plaintiff's allegation by following policy, referring the inmate complaint for further review under PREA, and relying on that process. *See Burks*, 555 F.3d at 595 ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job.").

A jury may view the hallway and dayroom video differently than Zenk and Fuchs did, but their conclusions about that evidence were not so unreasonable as to constitute deliberate indifference.  They were viewing the video evidence through the lens of a conduct report alleging a verbal altercation between plaintiff and Suprise at his cell.  Their observations that the video does not contain any audio and does not show what plaintiff is doing inside his cell are accurate.

All in all, it will be for a jury to decide how to weigh the video and other admissible evidence with respect to Suprise.  But the remaining defendants are entitled to summary judgment in their favor, so the court will not reach defendants' alternative qualified immunity argument.

ORDER

IT IS ORDERED that:

1. Plaintiff's motion for leave to file a sur-reply, Dkt. 62, is GRANTED.

2. Defendants' motion for summary judgment, Dkt. 25, is DENIED with respect to plaintiff's claim against defendant Ashley Suprise and GRANTED in all other respects.

3. Plaintiff's motion to compel, Dkt. 60, is DENIED.

4. Discovery is reopened through January 9, 2026 for the limited purpose of allowing the parties to meet and confer about any remaining discovery issues related to plaintiff's claim against Suprise. The parties are ORDERED to meet and confer by that date. Any unresolved discovery issues may be raised as part of the parties' pretrial submissions.

5. To allow the parties an opportunity to digest this ruling in preparation for trial, the court makes the following adjustments to the case schedule:

    a. Pretrial submissions and motions in limine shall be due January 15, 2026, and responses shall be due January 29, 2026.

    b. The court will hold its first final pretrial conference on February 10, 2026 at 11:00 a.m. via Zoom.

    c. The second final pretrial conference remains in person on February 17, 2026 at 8:30 a.m. with jury selection and trial to begin at 9:00 a.m.

6. The parties must review the court's trial preparation order attached to this order in preparation for trial.

Entered December 23, 2025.

BY THE COURT:

/s/

_____
ANITA MARIE BOOR
Magistrate Judge

28